JOHN T. MCGRATH & another, special administrators, *vs.*
C. T. SHERER COMPANY & others.

Worcester.   September 25, 1934. — May 11, 1935.

Present: RUGG, C.J., CROSBY, PIERCE, & FIELD, JJ.

*Sale,* Rescission.   *Equity Jurisdiction,* Rescission, Laches.   *Fraud.*
*Equity Pleading and Practice,* Bill, Parties, Abatement.   *Executor*
*and Administrator,* Special administrator.   *Survival of Action.*

The bill, in a suit in equity against a corporation and two persons who
were officers and stockholders of it to rescind a purchase of shares
of its stock by the plaintiff in reliance upon fraudulent misrepre-
sentations of fact made by one of the individual defendants, was
not demurrable in that it did not sufficiently set forth such misrepre-
sentations, the making of them by that defendant as the agent of the
corporation and with the knowledge and approval of the second indi-
vidual defendant, a seasonable election by the plaintiff to rescind the
sale, and a proper offer by the plaintiff to put the defendants *in statu*
*quo;* nor in that the plaintiff had an adequate remedy at law; nor in
that the bill showed on its face that the plaintiff had been guilty of
laches; nor in that it was multifarious because the plaintiff sought both
rescission of his purchase from the corporation and relief against the
individual defendants.

A decree granting relief by rescission was proper in the suit in equity
above described where the trial judge made findings, not plainly
wrong on evidence reported on appeal, that the first individual ·de-
fendant, with the knowledge and approval of the second, proposed to
the plaintiff that the corporation be reorganized, that the plaintiff
invest a·substantial sum of money therein and that the individual ·
defendants invest additional money therein, with a view to a subse-
quent sale of its business or of the plaintiff's and the individual de-
fendants' stock and the making of a large profit by the plaintiff; that
the first individual defendant made to the plaintiff false and fraudulent
representations of material facts as to the financial condition of the
corporation and its earnings; that the plaintiff relied upon such mis-
representations in purchasing his stock, although he was also actuated
by the motive of making a large profit out of the transaction; that the
transaction was ratified by the corporation; that seasonably after
learning of the falsity of such representations the plaintiff notified the
corporation of his election to rescind and offered to return his stock,
together with the dividends which he had received thereon and fees
which he had received as a director of the corporation; that although the
plaintiff continued for a period thereafter to act as director he received
no benefit therefrom; and that the plaintiff was not guilty of laches.

The plaintiff was not barred from maintaining the suit in equity above described by the fact that, upon electing to rescind, he did not offer to provide for the repayment to the individual defendants of the additional money invested by them in the corporation or for the restoration to them of their original positions as stockholders.

A special administrator, without specific authority from the Probate Court, could prosecute a suit in equity to rescind a purchase of corporate stock by the decedent.

A suit in equity to rescind a purchase of corporate stock made in reliance upon false representations by the defendant did not abate by reason of the death of the plaintiff occurring after the suit had been tried on the merits, the trial judge had made findings of fact and a final decree in the plaintiff's favor had been entered, even though the defendant on appeal was entitled to a review of the facts.

BILL IN EQUITY, filed in the Superior Court with a writ of summons and attachment dated November 12, 1931, and afterwards amended, by Theodore T. Ellis against C. T. Sherer Company, Joseph F. Sherer, and Herbert W. Estabrook.

Proceedings in the suit are described in the opinion. The interlocutory decree overruling the demurrer was entered by order of *Lummus,* J. The suit was heard by, and the final decree entered by order of, *Dillon,* J. The interlocutory decrees admitting the special administrators to prosecute the suit, and overruling the defendants' pleas, were entered by order of *W. A. Burns,* J., and *Williams,* J., respectively.

*C. C. Milton,* (*F. L. Riley, G. S. Taft & M. S. June* with him,) for the defendants.

*G. H. Mirick,* (*D. Whitcomb & P. R. O'Connell* with him,) for the plaintiffs.

CROSBY, J. This is a bill in equity seeking to rescind a contract whereby the plaintiff purchased stock of the defendant corporation relying upon alleged fraudulent misrepresentations of material fact. The representations were made to him by the defendant Joseph F. Sherer with the knowledge and approval of the defendant Herbert W. Estabrook, respectively the treasurer and president of the defendant company. The defendants demurred to the bill. After motions to amend the bill and answer had been allowed, the demurrer was overruled and the defendants appealed therefrom. A hearing was had on the merits, the

evidence being reported pursuant to G. L. (Ter. Ed.) c. 214, § 24, and Rule 76 of the Superior Court (1932). The judge made certain findings of fact and rulings of law as well as an order for a final decree, which in due course was entered, ordering rescission. From this decree the defendants appealed. Subsequently the plaintiff died. The special administrators of his estate entered a suggestion of death and moved that they be allowed to appear and prosecute the suit. This motion was allowed "without prejudice" to any rights the defendants "may have to raise the question by plea in bar or otherwise, whether the cause of action survives." From the interlocutory decree entered in pursuance of this motion the defendants appealed. Thereafter each defendant entered a "plea in bar" and moved to have the suit dismissed on the ground that it did not survive. These pleas were overruled and the defendants appealed. The case is now before this court on the defendants' appeals from the interlocutory decree overruling the demurrer, from the final decree, from the decree allowing the special administrators to appear and prosecute, and from the decrees overruling each "plea in bar."

The bill alleges, in substance, that the defendants Sherer and Estabrook, respectively the treasurer and president of the C. T. Sherer Company, a Massachusetts corporation conducting a large department store in Worcester, in order that they might effect a sale of their interests in the corporation, or a sale of the business which they controlled through stock ownership thereof, sought to solicit the financial aid of the plaintiff. To this end the defendant Sherer, with the full knowledge and acquiescence of the said Estabrook and as agent of the corporation, interviewed the plaintiff on or about January 21, 1929, and on the strength of a balance sheet of the C. T. Sherer Company as of December 31, 1928, which balance sheet the defendant Sherer then exhibited to the plaintiff, represented as follows: "(a) That several chain stores, at least three in number, had already approached the officials of the C. T. Sherer Co., seeking to buy out the business of said corpora-

tion or the stock control thereof; (b) That by reason of the large bank indebtedness owed by the corporation, evidenced by notes, a sale upon advantageous terms could not be effected; (c) That the C. T. Sherer Co. had never been through a banker's hands; (d) That it was undercapitalized; (e) That a plan of reorganization was proposed by which capital stock was to be issued against the old capital stock, the surplus and the amount of the note indebtedness owed banks; that every other item on the balance sheet or schedule of assets and liabilities would remain exactly as it was before the reorganization was effected; (f) That the C. T. Sherer Co. had made over One hundred thousand dollars ($100,000) every year with but one exception, for the past twenty years, and had paid dividends as high as fifty to one hundred per cent per annum; (g) That the value of the assets of the company were conservatively figured, with a setup of proper reserves to take care of bad debts and slow moving merchandise; (h) That if the plaintiff would advance the sum of Two hundred fifty thousand dollars ($250,000) to the corporation and accept Sixty-two hundred fifty (6250) shares of the capital stock to be issued on the reorganization, the defendants Sherer and Estabrook would between them advance the sum of Eighty thousand dollars ($80,000), which would be sufficient to pay up and effect the cancellation of the note indebtedness owed by the company to the bank; (i) That the plaintiff would be made a director of the corporation . . .; (j) That a sale of said business or of the stockholdings of the plaintiff in the C. T. Sherer Co. would be effected within a reasonable time, provided he furnished capital to the extent of two hundred fifty thousand dollars ($250,000), and that he could be guaranteed six per cent on his investment in any event and a handsome profit on the sale of the business of the C. T. Sherer Co. or the stockholdings of the plaintiff and those of the defendants, Sherer and Estabrook therein, which should net the plaintiff fifty per cent on his investment; (k) That the salaries of the president and treasurer should not be increased over and in excess of the amount which they had formerly received from the cor-

poration." The foregoing representations are set forth in paragraph 5 of the bill. The bill alleges that in reliance upon the said representations which were in part untrue and known to be false, the plaintiff paid to the C. T. Sherer Company the sum of $250,000 on January 30, 1929, and received a receipt on account thereof. After the plan of reorganization of the C. T. Sherer Company was consummated the plaintiff received permanent stock certificates for six thousand two hundred fifty shares.

It is specifically alleged in the bill that the defendants Sherer and Estabrook had, at or about the close of the calendar year 1928, owed the C. T. Sherer Company $40,731.08 for moneys advanced or merchandise purchased and charged to both or either of them, which indebtedness was cancelled by writing up the fixture account of the corporation a corresponding equal amount, and by other false and improper entries made in the records of the company; that a rent bill owed by the corporation and payable in advance, totalling $8,950.91, was not included or considered as a liability in the report of schedules of assets and liabilities as explained to the plaintiff; that merchandise, consisting of refrigerators, victrolas and radio sets, was carried in the inventory at full value although the individual defendants knew of the necessity of making provision for losses due to depreciation and obsolescence. It is further alleged in the bill that the balance sheet made no provision for doubtful and uncollectible accounts, and that other items were listed as assets, when they could not properly be considered as such.

The demurrer will first be considered. The defendants contend the demurrer should be sustained on the following grounds: that the bill sets out no cause of action entitling the plaintiff to relief; that the plaintiff has a plain and adequate remedy at law; that the plaintiff has been guilty of laches; and lastly that the bill is multifarious. We are of opinion that the demurrer was properly overruled. The main contention of the defendants under the first ground of demurrer is that the bill does not contain a sufficient allegation of the material elements of fraud to

entitle the plaintiff to rescind. The defendants contend that as to the allegations in paragraph 5, (a) to (k) inclusive, there is no subsequent allegation that these alleged representations were false and known to the defendants to be false. They contend that although paragraph 6 specifically sets out that these representations "were in part untrue and known to be false," nevertheless there is no allegation that these representations were false and known to be false because the plaintiff then proceeds to particularize, setting out that the tentative balance sheet and the statements with reference thereto were false and fraudulent. It is sufficient to say that the allegation that the representations "were in part untrue and known to be false" was not nullified or rendered ineffective by the subsequent particularization. Whether allegations in other paragraphs of the bill concern matters of judgment or opinion, or were promissory in nature, is not necessary to consider. It is plain that the bill contains a sufficient allegation of the material elements of fraud to entitle the plaintiff to rescind.

The defendants contend under the first ground of demurrer that the allegations in paragraph 6, that the false statements of the defendant Sherer were made with knowledge of the defendant Estabrook, are not sufficient to charge the latter with the alleged fraudulent acts of Sherer. This contention is without merit. The bill alleges "That the defendants, Sherer and Estabrook, in order that they might effect a sale of their interests in the C. T. Sherer Co. or a sale of the business of said corporation, which they controlled through stock ownership thereof, sought to solicit the financial backing and aid of the plaintiff. To this end the defendant Sherer, with full knowledge of the said Estabrook and as agent of said corporation, interviewed the plaintiff on or about the twenty-first day of January 1929. On that occasion, and on the strength of a balance sheet of the C. T. Sherer Co., as of December 31, 1928, which balance sheet the defendant, Sherer, then exhibited to the plaintiff, it was represented as follows: . . . ."

The allegations of the bill are that these defendants acted in concert.

The defendants further contend under the first ground of demurrer that the bill does not allege with definiteness a seasonable election to rescind and an offer to return the stock. This contention is without merit. The plaintiff alleges in paragraph 14 that he, at his own expense, "caused an audit to be made of the affairs of the company and the various matters hereinbefore recited were disclosed for the first time . . ." and in paragraph 15 it is alleged "That upon completion of said audit and its disclosure of the fraud . . . the plaintiff again notified the corporation of his desire and his election to rescind his contract, and tendered the corporation the stock certificate and/or certificates standing in his name in the aggregate amount of Sixty-two hundred fifty (6250) shares . . . ."

The last contention made by the defendants under the first ground of demurrer is that there is no offer on the part of the plaintiff to restore the defendants Sherer and Estabrook to their former position, they having turned over to the corporation $80,000 for additional stock at the same time the plaintiff paid to the corporation $250,000 for the same purpose. Although generally it is true that, where the right to rescind is exercised, both parties must be put *in statu quo*, *Fitch* v. *Ingalls*, 271 Mass. 121, 129, it is also true that "'When a party seeking to rescind a contract on the ground of fraud acts without unnecessary delay and restores or offers to restore that which he has received, it is no defense that the wrongdoer has by his own act made a full restoration impossible on his part or has entered into obligations to others.'" *O'Shea* v. *Vaughn*, 201 Mass. 412, 423. The principle above stated is applicable in view of the allegations of the bill.

The defendants' contention that the plaintiff has a plain and adequate remedy at law cannot be sustained. An adequate remedy at law which will deprive a court of equity of jurisdiction is a remedy as certain, complete, prompt and efficient to attain the ends of justice as the

remedy in equity. *Farwell* v. *Colonial Trust Co.* 147 Fed. Rep. 480, 482. A court of law cannot compel the defendant corporation to strike out the plaintiff's name from its list of stockholders, which is a part of the remedy to which he is entitled if the allegations of the bill are proved. *Dennette* v. *Boston Securities Co.* 206 Mass. 401, 404. *Farwell* v. *Colonial Trust Co.* 147 Fed. Rep. 480, 482, 483. Compare *Keuper* v. *Pyramid Bond & Mortgage Corp.* 113 N. J. Eq. 376; *Cochran* v. *F. H. Smith Co.* 20 Del. Ch. 159, 163.

The third ground of demurrer is that the bill on its face shows the plaintiff has been guilty of laches. *Stewart* v. *Joyce,* 201 Mass. 301, 307. It appears from the bill that the plaintiff entered into the contract in question in January, 1929. It is alleged that subsequently, at various meetings of the board of directors and at other times, the plaintiff requested the defendants Sherer and Estabrook to furnish him with an audit or schedule of the affairs of the company, but that such statements as he was able to obtain did not represent the true condition of the company; that the plaintiff at his own expense caused an audit to be made and the various matters recited in the bill were disclosed for the first time; and that the plaintiff notified the corporation of his desire and election to rescind his contract, and tendered the corporation the stock certificate or certificates, but that the corporation refused to recognize his demand. The bill was filed December 7, 1931. It does not disclose that the plaintiff, with knowledge of the facts, has been guilty of an unconscionable delay in asserting his rights to the prejudice of the defendants. *Stewart* v. *Finkelstone,* 206 Mass. 28, 36.

It is further urged that the bill is multifarious in that it includes two unconnected causes of action, namely, an alleged misrepresentation inducing the plaintiff to enter into a contract with the defendant corporation which he seeks to rescind, and alleged misrepresentations and fraud of the individual defendants Sherer and Estabrook for which the plaintiff seeks to hold them personally liable. While the relief sought is various in detail, in substance the plaintiff has one complaint, and all the persons named

as defendants in the bill have, according to the allegations, been guilty of conduct which gives him a right to relief in respect of that one matter, namely, the making of fraudulent representations inducing him to purchase shares of stock in the corporation to be reorganized. It is plain that the bill is not multifarious. See *Frankenburg* v. *Great Horseless Carriage Co.* [1900] 1 Q. B. 504, 508, 509; *Barcus* v. *Gates*, 89 Fed. Rep. 783, 791, 792.

The bill sets out a cause for relief in equity and the demurrer was properly overruled.

The findings of fact by the trial judge are as follows:

"The defendant corporation conducts and has conducted for many years a large department store located in Worcester, Massachusetts. Prior to the acts complained of by the plaintiff, its stock was held by the families of the defendants Sherer and Estabrook. The defendants Joseph F. Sherer and Herbert W. Estabrook were and had been for several years the respective treasurer and president of the defendant corporation, as well as being two of the directors thereof.

"The C. T. Sherer Company was and is a Massachusetts corporation, its by-laws, among other things, containing provision by which the management and control of its business is vested in the hands of its directors.

"During the latter part of the year 1928 the defendants Sherer and Estabrook, who together controlled the majority stock of the corporation, were desirous of retiring from their business activities in running a department store. They sought to effect a sale of the business of the defendant corporation or a sale of their stock ownership therein. To this end, and at the suggestion of a broker or banker, the defendant Sherer caused to be prepared a statement of the assets and liabilities of the defendant corporation as of December 31, 1928, and including figures of the earnings and dividends of the defendant corporation for several years next prior thereto. In addition he also had prepared a schedule of the gross receipts of the business for some few years prior to January 1, 1929.

"By reason of large banking indebtedness owed by the

defendant corporation, totaling at least $330,000, the defendants Sherer and Estabrook were unable to effect a sale upon advantageous terms.

"On or about January 21, 1929, the defendant Sherer came to the office of the plaintiff to solicit his financial aid and backing in behalf of the corporation. The defendant Sherer at that time exhibited to the plaintiff the balance sheet of the corporation as of December 31, 1928, and showed the latter a memorandum listing the dividends paid by the company and its net earnings for several consecutive years.

"At that time and in the course of the conversation between the parties, the defendant Sherer represented to the plaintiff that several chain stores had already approached the officials of the C. T. Sherer Company, seeking to buy out its business or the stock control thereof; that the corporation could not make a sale upon advantageous terms by reason of its large banking indebtedness; that the company had never been through a banker's hands and was undercapitalized; that it was proposed to effect a reorganization by issuing new capital stock of no par value in place of the then outstanding capital stock of $100 par value against the old capital and surplus and the amount to be subscribed for the additional stock in the amount of $330,000; that every other item on the balance sheet that was exhibited to the plaintiff, both with respect to assets and liabilities, would remain as it was.

"It was further represented to the plaintiff by the defendant Sherer that the company had made over $100,000 every year with but one exception for the past twenty years, when it made $50,000, and had paid dividends as high as fifty to one hundred per cent per annum. In response to questions asked of the defendant Sherer by the plaintiff, particularly with reference to the matter of reserves for doubtful accounts and slow moving merchandise, the defendant Sherer stated that adequate reserves to cover such contingencies had been set up and were reflected in the balance sheet. The defendant Sherer also represented, among other things, in response to the direct question put

to him by the plaintiff, that the fixture account was carried on the balance sheet at actual cost to the company and that everything in the statement shown to the plaintiff was 'down to bed rock and brass tacks' and that there was a dollar of actual value behind every dollar represented by the statement itself.

"It was represented to the plaintiff by the defendant Sherer that if the former would put money in the company to the amount of $250,000, the defendants Sherer and Estabrook between them would advance the sum of $80,000 which amount would be sufficient to pay up and effect the cancellation of the note indebtedness owed by the company to the banks. For such advancement of cash the plaintiff would receive 6,250 shares of the capital stock of the corporation and be made a director, entitling him to a director's fee, and that after the reorganization a sale of the business would be effected within a reasonable time at a figure that would be highly remunerative to the plaintiff with a profit of at least fifty per cent on his deposit; that until the time of such sale the salaries of the president and treasurer, the respective defendants Estabrook and Sherer, should not be increased over and in excess of the amount which they had formerly received from the corporation.

"The plaintiff did not conceal his interest in the proposition but informed the defendant Sherer that he wished to think over the proposition and that in any event it would take him some few days to provide, by the sale of certain of his investments, the necessary funds to put into the project. Some few days later the plaintiff wrote the defendant Sherer that his funds were available and that he was ready to make his commitment in the defendant corporation. He requested that the defendant Sherer furnish him with some memoranda showing the basis of what he was to get for the money he was paying in. He was informed by the defendant Sherer that the books of account and other memoranda were at the auditor's office in Boston, and were not then available, but that the plaintiff might have faith in him and rely on what had been told him by the defendant one hundred per cent.

"On January 28, 1929, the C. T. Sherer Company, by its treasurer, the defendant Joseph F. Sherer, wrote the plaintiff a letter which outlined and reduced to writing several of the former oral representations made to the plaintiff, and in addition contained the representation that the store had made money every year with but one exception, for twenty-seven years. On January 30, 1929, the defendant Sherer came to the plaintiff's office, having previously notified him that on that date it was desired that the note indebtedness of the corporation to the banks be liquidated, and requested that the plaintiff provide him with funds to the extent of $250,000, for the above set forth purposes. Again the plaintiff asked the defendant [Sherer] for a copy of the statement of condition of the defendant corporation which had been exhibited to him so that he might have it for his files. Again he was informed by the defendant Sherer that he did not have an extra copy; that the books were all with the auditors, but that everything he had represented to the plaintiff was 'the god's honest truth.' Furthermore, the evidence disclosed that the plaintiff and the defendant Sherer had known each other for a number of years prior to these negotiations, and their relations were friendly. They had many social contacts in common.

"Thereupon, and in reliance upon the representations made to him, the plaintiff gave the defendant Sherer a check for $250,000, and some time later in the day received the following receipt: 'Temporary Stock Receipt. Received of Theodore T. Ellis, Two hundred and fifty thousand dollars ($250,000), Certificate to be delivered later for 6250 shares of the capital stock of the C. T. Sherer Company. C. T. Sherer Company, Joseph F. Sherer Treasurer. (L. S.)' The plaintiff's check to the defendant Sherer was duly indorsed and deposited to the account of the defendant corporation.

"The probability of a quick profit to the plaintiff as a result of the sale of the business was not the sole controlling motive which induced him to part with his money.

"The negotiations between the defendant Sherer and the

plaintiff were carried on with the full knowledge, connivance, and consent of the defendant Estabrook who, though slightly ill at the time, was kept informed of the entire transaction by his brother-in-law, the defendant Sherer.  In addition, and at respective meetings of the stockholders and directors of the C. T. Sherer Company, the entire transaction was fully discussed and the action of the treasurer ratified and confirmed, as well as the acceptance of the funds for the purposes above mentioned.  Estabrook made no protest.

"In the reorganization of the defendant corporation the plaintiff was duly elected one of the five directors thereof, and subsequent thereto attended such meetings as the records disclose.  The other four directors were Joseph F. Sherer, Herbert W. Estabrook, Osborne Sherer, and James E. Osborne, all of whom were related to one another by blood or marriage.

"From time to time, the plaintiff requested that the defendant Sherer furnish him with the financial statement of the defendant corporation which was originally exhibited to him and which was in part relied upon by him in making his investment.  Excuses were given by the defendant Sherer and it was not until April 5, 1930, that a copy of that balance sheet was delivered to the plaintiff.

"In order that the plaintiff might have accurate information as to the current financial affairs of the defendant corporation, he made requests that he be furnished with working sheets showing the true condition of the business of the corporation.  Excuses were given as to why these statements were unavailable.

"Eventually and by reason of the failure to obtain the detailed information requested, the plaintiff at his own expense caused an independent audit to be made of the defendant corporation which demonstrated that the representations of the defendant Sherer to him were false.  The audit disclosed that the balance sheet as of December 31, 1928, was inaccurate and untrue in the following respects:

"A.  No reserve whatever was set up for bad or doubtful accounts receivable or for contingent liability of the

defendant corporation on discounted sales leases. On the evidence $7,500 would represent a reasonable reserve to cover this . . . [item] and should have been deducted from the assets to reflect the true financial condition of the corporation.

· "B. That the item for fixtures as set forth in the December 31, 1928, balance sheet did not represent cost to the defendant corporation, but included an appreciation of the fixture account in the amount of $40,931.08 occasioned by the unlawful and fraudulent acts of the defendants Sherer and Estabrook in writing off from the accounts receivable personal indebtedness owed by them to the corporation in an exact similar amount.

"C. The statement included among the assets an item known as the 'Lamson Contract' which had been terminated and was of no value on December 31, 1928. This amounted to $7,550 and was included most improperly in the accounts receivable.

"D. That the figure representing the inventory value included certain obsolete merchandise known as Servel Refrigerators and unsalable victrolas and radios, which were charged off in the amount of $28,436 within six months from December 31, 1928. No reserves having been set up on the books for this item, there was an unwarrantable and unpardonable overstatement of the value of the inventory to this extent.

"E. The liabilities in the balance sheet were understated to the extent of $8,950.91 which was the amount of rent then owed by the defendant corporation to its landlord under the terms of a written lease.

"The total net worth of the corporation as of December 31, 1928, was overstated in the balance sheet in an amount of $85,536.06 allowing full credit for certain assets that were not included in its statement, namely, certain equities in mutual insurance companies, amounting to $4,842, accounts receivable, suspense $943.38, and correction for reserve for depreciation of fixtures totaling $2,046.55, or a total of $7,831.93.

"The balance sheet of December 31, 1928, was an exact

transcript of the books of the defendant corporation, so that the discrepancies disclosed by the audit could not have been discovered except by a thorough investigation by an expert accountant.

"Furthermore, the manner in which the defendants Sherer and Estabrook caused the books of the corporation to conceal the cancellation of their personal obligations and the write-up in the fixture account of a corresponding amount, was so cunningly and skillfully designed that the same could not have been discovered by an audit made prior to the early part of 1931, when the concealment was disclosed through correcting entries made at that time in the books of the defendant corporation. The corporation books as of December 31, 1928, showed an apparent purchase of fixtures just prior thereto from the R. C. Taylor Trust. Entries on stubs of the check books of the corporation indicated that checks payable to the R. C. Taylor Trust in the amount of $40,931.08, were issued in payment therefor. The undisputed evidence in this particular was that the R. C. Taylor Trust never received the checks which were apparently issued to it and never in fact sold the fixtures for which the checks purported to be given. The defendant Sherer altered the checks in question so that they were deposited to the account of the defendant corporation, and the amounts thereof credited to cancel the personal obligations of the defendants Sherer and Estabrook. The checks were not in evidence although the defendants were duly given a legal notice to produce the same. A former employee of defendants who had some knowledge of the checks was reported to be somewhere in England at the time of trial.

"The records of the corporation show no appropriate corporate action authorizing such procedure. This transaction was not disclosed to the plaintiff at the time of his investing in the defendant corporation.

"The audit further made known to the plaintiff that the defendants Sherer and Estabrook doubled their salaries over what they had received up to December 31, 1928, from $25,000 per annum to $50,000 per annum in the aggregate. At no time up to the date of the audit was it

ever disclosed to the plaintiff that the salaries of the defendants Sherer and Estabrook had been increased. Furthermore, the minutes of the directors' meetings from January 1, 1929, up to the date of the trial are silent in this particular.

"The representations made by the defendant Sherer to the plaintiff as to the net annual earnings of the defendant corporation for the twenty years next prior to January 1, 1929, were false and fraudulent and known to be so by the defendant Sherer.

"The written representation made to the plaintiff that the corporation had made money in every year but one, was likewise false and fraudulent and known to be so by the defendant Sherer. The statement of the net earnings of the defendant corporation after all expenses were deducted for nine years next prior to January 1, 1929, which the defendant Sherer testified he exhibited to the plaintiff on January 21, 1929, was false and fraudulent. It represented an average overstatement of approximately $60,000 per year as disclosed by the books. The true net earnings were only approximately one third of the net earnings as appeared in that statement.

"Upon completion of the audit, June 30, 1931, the plaintiff for the first time learned of the true condition of the defendant corporation as of December 31, 1928. Upon all the evidence the plaintiff seasonably notified the defendant corporation of his election to rescind the contract which was entered into by him in reliance upon the false and fraudulent material misrepresentations made to him by the defendant Sherer with the full knowledge, consent and acquiescence of the defendant Estabrook.

"All of these misrepresentations were made for the purpose of inducing the plaintiff to invest $250,000 in the defendant C. T. Sherer Company, which enured to its benefit.

"The positions of the various defendants have not been changed as a result of any delay in instituting these proceedings by the plaintiff. He has not been guilty of laches.

"And the plaintiff seasonably disaffirmed the executed contract of sale and made adequate tender of the stock and

all benefits derived therefrom. The effect of this was to place the defendant corporation *in statu quo*. This tender was refused as is admitted in the defendants' answer, and the conduct of the defendants constituted a waiver of all formalities precedent to the bringing of this bill.

"The office of director of the defendant corporation which the plaintiff held between the dates of his election to rescind and March 17, 1932, was a mere empty title to a useless office. Neither the title nor the office was of any benefit either to the plaintiff or to the defendants, especially in view of the inter-relationship of the other four directors and the control of the business exercised by them.

"The only pecuniary benefits derived by the plaintiff from his investment in the stock of the defendant corporation were a dividend of $6,250 paid him April 5, 1930, and sundry directors' fees amounting to $340 or a total of $6,590, which he offered to return to the defendant corporation before instituting these proceedings.

"The petitioner was induced to enter into the transaction with the defendant corporation through the fraudulent machinations and wiles of the defendants Sherer and Estabrook. The investment they made at the time the petitioner made his investment in the defendant corporation was pursuant to their own fraudulent scheme."

The trial judge found that the plaintiff never ratified the fraud practised upon him and was entitled to a decree of rescission. There is a full report of the evidence. It is the duty of this court to decide the case upon its own judgment giving due weight to the findings of the trial judge and not reversing them unless plainly wrong. *Moss* v. *Old Colony Trust Co.* 246 Mass. 139, 144. *Berman* v. *Coakley*, 257 Mass. 159, 162. *Albert Richards Co. Inc.* v. *Mayfair, Inc.* 287 Mass. 280, 284. We are of opinion that the findings of the trial judge are supported by evidence and cannot be said to be plainly wrong. The contention of the defendants with reference to the various findings cannot be adopted. It is argued that irrespective of any statements with respect to either the corporation or its earnings of dividends made by the defendant Sherer, or whether the state-

ment of 1928 showed accurately the financial condition of the corporation, Ellis was induced to make the contract because of his desire for a large gain, and all other considerations were incidental conditions and in no way operating or inducing him to pay his money. Although it is plain from the evidence that he entered into the transaction intending to make a large profit through a sale of the business, it is equally plain that he was not actuated solely by this motive. He testified that he questioned Sherer with reference to the accounts receivable, the inventory and the fixture account, and that he relied upon the representations made by him. There was evidence that the plaintiff wrote Sherer: "I went into this proposition . . . with at least six per cent interest and whatever additional profit I could derive from the sale of the business . . . ."

It is contended by the defendants that the finding that the defendant Sherer stated that adequate reserves to cover doubtful accounts and slow moving merchandise had been set up and were reflected in the balance sheet was plainly wrong. There is nothing in this contention. The plaintiff testified that he questioned Sherer in reference to the accounts receivable and was assured that adequate reserves had been set up to take care of any and all depreciations in the accounts receivable that would naturally occur.

The trial judge found that on January 30, 1929, the plaintiff asked the defendant Sherer for a copy of the statement of condition of the defendant corporation which had been exhibited to him so that he might have it for his files, and again was informed by Sherer that he did not have an extra copy, that the books were all with the auditors. It is contended by the defendants that this finding was not in accord with any evidence in the case. On January 22, the day after the statement of condition was exhibited to the plaintiff, he wrote to Sherer and, referring to the interview of the previous day, requested "full details of the proposition" that he might "study it carefully." After this letter was sent, and before the plaintiff again wrote Sherer, which was January 26, the plaintiff had a telephone conversation with Sherer and requested "a statement of condition" from him.

In the letter of January 26 the plaintiff wrote Sherer stating that he had not received the information which he had requested in his note of January 22, which he wanted so that he could get the details set in his mind. Immediately afterwards, the plaintiff received a telephone call from Sherer who stated, in reference to the request that had been made in the letter of January 22, that his books were down in Boston being audited and he would send the information requested as soon as the books were received. The plaintiff testified that at the conference of January 30, when Sherer asked for the $250,000, he stated, "I haven't received any statement from you that I have asked for," and Sherer replied, "I can't give you the statement because the books are still down in Boston . . . ." On all the evidence it cannot be said that the finding of the judge was plainly wrong. It is not material that it does not appear that the plaintiff requested the statement "for his files." On January 23, 1930, the plaintiff in a letter requested "a copy of the original set up on which I joined you." Again on April 2, 1930, the plaintiff in a letter to Sherer requested "the original set up you showed me, when I made my investment."

It is the contention of the defendants that there is no justification for the finding that the negotiations with the plaintiff were carried on with the full knowledge, connivance and consent of the defendant Estabrook. This contention is without merit. There was evidence that Sherer at the first interview told the plaintiff that his partner Estabrook and he were tired of the business and they wanted the plaintiff to join them in the reorganization of the company in order to sell the business, and that if the plaintiff would take $250,000 new capital stock he and his partner would take $80,000. Sherer testified that after he had seen the plaintiff on January 21 he went and saw Estabrook and told him about the conversation and giving the plaintiff a statement of the earnings and dividends and a statement of the report of the condition of the company as of December 31, 1928. Estabrook testified that subsequently to Sherer's call he gave the checks that he put in the proposition and left it to Sherer to work out and complete the negotiations.

The defendants contend that "there is no evidence that 'the entire transaction,' (including the alleged misrepresentations of Mr. Sherer), was ever ratified at any meeting of stockholders or directors." There was no such finding. The finding was that "the entire transaction was fully discussed and the action of the treasurer ratified and confirmed, as well as the acceptance of the funds for the purposes above mentioned." This finding was fully supported by evidence.

The defendants contend that the finding with respect to the salaries of Sherer and Estabrook has no proper place in the findings of the judge. There is no merit in this contention. The representations of the defendant Sherer on January 21, 1929, were made with reference to the condition of affairs of the corporation as of December 31, 1928. The plaintiff inquired as to Sherer's attitude respecting salaries, and Sherer stated that he would not increase their salaries. This was equivalent to a representation that the conditions with respect to salaries were to remain the same as of December 31, 1928. The defendants Sherer and Estabrook, on January 1, 1929, doubled their salaries over what they had received up to December 31, 1928, from $25,000 per annum to $50,000 per annum in the aggregate.

The defendants contend that there was no evidence that the representation that the company had made money every year but one for twenty-seven years was false and fraudulent. It is conceded by the defendants that there was a loss shown in the year ending January 31, 1927. It appears from the certificate of condition for the year 1908, that at the end of the fiscal year, March 1, 1908, the surplus was $29,428.75. In April, 1908, there was paid in dividends $12,000 which would leave the surplus at $17,428.75. It appears from the certificate of condition for the year 1909, however, that at the end of the fiscal year, March 1, 1909, the surplus was $15,000 showing a loss for the year of $2,428.75. The same result is reached by computing and comparing the net worth of the corporation in March, 1908, with its net worth in March, 1909, giving proper effect in the computation to the fact of the dividend payment in April, 1908. There was testimony to the effect that the loss for eleven months from

February 1, 1920, to December 31, 1920 (when the fiscal year was changed), was $39,650.07. This warranted a finding that there was a loss for that year. The finding on this branch of the case is supported by evidence and cannot be said to be plainly wrong. There was evidence to the effect that the books of the corporation showed that the company had not made $100,000 every year for the past twenty years, and that since 1916 it had not made that amount in any year. The representation that the corporation had never made less than $100,000 a year for twenty years, with a single exception, was fairly susceptible of the meaning that its net profits were not less than that amount. The contention of the defendants that the plaintiff has failed to sustain the burden of establishing that the representation that the company had made over $100,000 every year with but one exception for the past twenty years was false and fraudulent cannot be supported.

The defendants contend that the judge was not justified in finding that the tabulation of the earnings for nine years prior to January 1, 1929, related to "true net earnings." The figures set out in the tabulation are gains (before depreciation, taxes and life insurance premiums) which the defendants submit are operating gains or profits. However that may be, the tabulation was captioned "Net After All Expenses Are Deducted," and plainly warrants the inference that the figures there set forth represent "true net earnings." And the further inference was warranted that since the tabulation of earnings had not been reduced by taxes and depreciation it did not represent "true net earnings." The defendants concede that if the finding with respect to "true net earnings" is warranted, the trial judge's computation was correct.

The defendants urge that the judge's finding that no reserve whatever was set up for bad or doubtful accounts receivable was plainly wrong, and that the finding that $7,500 would represent a reasonable reserve to cover this item and should have been deducted from the assets to reflect the true financial condition of the corporation was unwarranted. These contentions are without merit. The sys-

tem used by the defendant corporation was to charge off bad debts as they occurred. The plaintiff's witness Woodward testified that in addition to the method adopted there should have been a reserve of $7,500 to reduce the accounts receivable to a fair balance and that a reserve of this character was not reflected in the statement of December 31, 1928, because he did not see it on the books of the corporation which he examined.

It is contended by the defendants that the finding that the item for fixtures, as set forth in the December 31, 1928, balance sheet, did not represent cost to the defendant corporation but included an appreciation of the fixture account in the amount of $40,931.08 occasioned by the unlawful and fraudulent acts of the defendants Sherer and Estabrook, in writing off from the accounts receivable personal indebtedness owed by them to the corporation in the same amount, was unjustifiable. This finding was warranted. The defendant Estabrook testified that prior to the end of 1928 he and Sherer felt that there was a fair chance of disposing of the business; that they were indebted personally to the corporation in the amount of $40,931.08 and concluded that that obligation should be off the books before they sold the business. Sherer testified, "We crossed off our own accounts and put it on the fixture account; it was fixed up, it was completed." Woodward testified that from his examination three checks totalling $40,931.08 were drawn payable to R. C. Taylor Trust and were charged to furniture and fixtures on the books but that he could not find vouchers of purchases of fixtures from the R. C. Taylor Trust for this amount, and a credit of the amount of the three checks was made to the personal accounts of Sherer and Estabrook. The defendants contend that the fixture account, even after the write up, may well have totalled an amount less than the net aggregate amount of "actual cost value" and less than "A dollar of actual value behind every dollar represented." The inference is warranted that the actual value of the fixtures was the value prior to the write up, with depreciation allowed, and that as a consequence of the write up there was

an overstatement of $40,931.08 in the net worth of the corporation.

The findings with respect to the "Lamson Contract" were not unwarranted. This contract involved the carrier system that had been in use in the store. The Lamson Company retained title to the equipment, charging a rental. On October 9, 1928, there was due or to become due on this contract $8,800. The defendant company decided to abandon the system and install a cash register system. On the last mentioned date the contract with the Lamson Company was cancelled by a payment of $4,250 and its equipment was removed. The contract with this company was nevertheless carried as an asset of $7,550 in the prepaid expense account on the December 31, 1928, balance sheet. It is plain that a finding was not unwarranted that the net worth of the corporation, as of December 31, 1928, should be reduced $7,550.

The defendants contend that the finding of the trial judge with respect to the value of the inventory was unwarranted. The plaintiff testified that the defendant Sherer stated that "there was a dollar of actual value behind every dollar represented on the statement itself." One Milne, an accountant employed by the plaintiff, examined the books, checked the inventory and made a computation of $28,436 as the proper sum to be deducted from the inventory, chargeable to the refrigerator, victrola and radio departments. There was evidence that the loss on refrigerators occurred in 1927. The defendants point out that the inventory of all merchandise in the statement of December 31, 1928, totalled $482,800 and that the real issue is whether the inventory figures in the statement as a whole represented an amount of goods at "cost price" or "a dollar of actual value behind every dollar represented on the statement itself." It is the defendants' contention that there was evidence that the merchandise was inventoried at less than cost and if the cost were recomputed, or account taken of the fact that on December 31, 1928, the country was in a period of rising prices, the merchandise might aggregate in value a figure

in excess of $482,800 even after allowing for reserve of $28,436 claimed. The inference is warranted that the actual value of the merchandise was the value stated in the inventory less $28,436, the deduction which was made. The finding that there was an overstatement of the value of the inventory to this extent was not unwarranted.

The finding with respect to the item of rent hardly requires comment. According to the terms of the lease the rent was payable monthly in advance. On December 1, 1928, the sum of $8,950.91 became due. It was paid in January, 1929. This item was not included among the payables scheduled on the December 31, 1928, balance sheet. The finding that the liabilities of the corporation were understated $8,950.91 was plainly warranted.

The decree awarding rescission on the findings of fact was proper. It is elementary that a plaintiff seasonably may rescind a contract which he has been induced to enter into in reliance upon false and fraudulent representations as to material facts. *Stewart* v. *Joyce*, 201 Mass. 301, 310. *Ginn* v. *Almy*, 212 Mass. 486, 492, 493. *Bates* v. *Cashman*, 230 Mass. 167. It is not necessary that the false representations should have been the sole or even predominant motive actuating the plaintiff in entering into the contract. It is sufficient if they had a material influence upon him although combined with other motives. *Windram* v. *French*, 151 Mass. 547, 553. *Light* v. *Jacobs*, 183 Mass. 206, 210. *Baskes* v. *Cushing*, 270 Mass. 230, 233. That the representations made to the plaintiff in the present case were false and that the plaintiff relied thereon have been determined. They were assertions of material facts, not expressions of opinion or mere seller's or promoter's talk as contended by the defendants. *Ginn* v. *Almy*, 212 Mass. 486, 503. *Noyes* v. *Meharry*, 213 Mass. 598. *Lufkin* v. *Cutting*, 225 Mass. 599, 604. Compare *Everett* v. *Foster*, 223 Mass. 553–555.

It is contended by the defendants that the plaintiff did not fully and completely rescind, but continued to receive benefits from the transaction in that he continued to act as a director receiving a fee therefor, even after the bill

was brought. The letter offering to return the stock and emoluments that had come to the plaintiff by reason of the transaction was dated July 29, 1931. There were two directors' meetings subsequent to this time which the plaintiff attended, namely, on December 14, 1931, and February 3, 1932. There is no evidence that the plaintiff received any compensation for attendance at these meetings. There were seventeen meetings of the directors subsequent to the appointment of the plaintiff as a director, and prior to July 29, 1931. A director's fee was $20 per month. The trial judge found that the plaintiff received director's fees amounting to $340. The inference is warranted that this sum was received as compensation for the seventeen meetings prior to July 29, 1931, and that the plaintiff received nothing for his attendance at the two subsequent meetings. The finding of the trial judge, that the office of director which the plaintiff held between the date of his election to rescind and March 17, 1932, was a mere empty title to a useless office, that neither the title nor the office was of any benefit either to the plaintiff or to the defendants, in view of the interrelationship of the other four directors, and the control of the business exercised by them, was not unwarranted. This finding disposes of this contention of the defendants. See *O'Shea* v. *Vaughn*, 201 Mass. 412, 420, 421.

The defendants further contend that while the plaintiff sought to return the stock and the dividends to the corporation, as well as the emoluments received as a director, he has not offered to provide for the repayment of the $80,000 invested by the defendants Sherer and Estabrook, nor has he provided for the restoration to them of their original position as stockholders. It is also contended that to place the defendant corporation *in statu quo* the reorganized company would have to be reorganized again. These contentions are disposed of by what was said in *O'Shea* v. *Vaughn*, 201 Mass. 412, 423, hereinbefore quoted.

The defendants contend that the plaintiff has been guilty of laches. There is no hard and fast rule as to what constitutes laches. It is generally a question of fact with the

burden of proof resting upon the defendant. *Alvord* v. *Bicknell*, 280 Mass. 567, 571. Compare *Tetrault* v. *Fournier*, 187 Mass. 58, 61. There is no evidence that the plaintiff had knowledge of the fraud practised upon him until the results of the audit were made known to him. The audit was commenced April 26, 1931, and a report was made to the plaintiff on or about June 30, 1931. This suit was begun on November 12, 1931, by a writ of attachment and entered in the Superior Court on the first Monday of December following. There is nothing to indicate that the plaintiff was negligent in failing earlier to ascertain the existence of the fraud which was perpetrated upon him. The finding of the trial judge that the plaintiff was not guilty of laches was warranted. *Stewart* v. *Finkelstone*, 206 Mass. 28, 36. *Lufkin* v. *Cutting*, 225 Mass. 599, 607, 608. *Loomis* v. *Pease*, 234 Mass. 101, 105.

Neither the exceptions to the rulings of the judge upon the admission of evidence, nor the exception to the allowance of the plaintiff's motion to amend the bill at the close of the evidence has been argued by the defendants; these exceptions need not be considered. *Tremont Trust Co.* v. *Noyes*, 246 Mass. 197, 205.

The refusal of the trial judge to grant requests for rulings of law is treated as presenting the principles which the appealing party would have this court apply in the performance of its duty to order a correct decree upon the pleadings and evidence, whatever view of the law was entertained by the trial judge. *Albert Richards Co. Inc.* v. *Mayfair, Inc.* 287 Mass. 280, 284.

There remains to consider the appeals from the decree allowing the special administrators to appear and prosecute, and the decrees overruling the pleas in bar.

The contention of the defendants that the special administrators, John T. McGrath and George H. Mirick, not being specially authorized by the Probate Court to prosecute this suit, have no right to be made parties plaintiff in this case, cannot be sustained. For the purpose of collecting and preserving the personal property of the deceased a special administrator may commence and maintain suits without

special authorization of the Probate Court. *Meagher* v.
*Kimball*, 220 Mass. 32, 33. G. L. (Ter. Ed.) c. 193, §§ 10,
11; c. 228, § 12. In *Purcell* v. *Purcell*, 233 Mass. 62, relied
upon by the defendants, the suit which the special admin-
istrators sought to prosecute was a bill in equity for a
reconveyance of real estate. There is nothing in *Albert E.
Touchet, Inc.* v. *Thompson*, 259 Mass. 220, which aids the
defendants.

Whether an action for damages or for rescission survives
where a purchase of stock has been induced by false repre-
sentations is not necessary to decide. See, however, *Squiers*
v. *Thompson*, 73 App. Div. (N. Y.) 552, affirmed 172 N. Y.
652; *Baker* v. *Crandall*, 78 Mo. 584; *Bullowa* v. *Gladding*,
40 R. I. 147; *Jones* v. *Ellis*, 68 Vt. 544; *Peek* v. *Gurney*,
L. R. 6 H. L. 377; *Twycross* v. *Grant*, 4 C. P. D. 40;
*Terry* v. *Sweeting*, [1899] 1 Ch. 387; *Davoren* v. *Wootton*,
[1900] 1 Ir. R. 273; *Piper* v. *Childs*, 290 Mass. 560, 565–566.
Even if a suit in equity for rescission does not survive the
death of a party, inasmuch as the present case has pro-
ceeded to a trial before a judge of the Superior Court re-
sulting in findings of fact and a final decree, the suit
against the defendants does not abate. *Stickney* v. *Davis*,
17 Pick. 169. *Wilkins* v. *Wainwright*, 173 Mass. 212,
214. *Perkins* v. *Perkins*, 225 Mass. 392, 396. *Fenelon*
v. *Fenelon*, 244 Mass. 14, 16, 17. *De Marco* v. *Pease*,
253 Mass. 499, 505. The fact that the appellants are en-
titled to a review of the facts does not alter the conclusion
reached. See *Rice* v. *Rice*, 184 Mass. 488. The case of
*Cummings* v. *Bird*, 115 Mass. 346, is not applicable. In
that case, which was in tort for libel, there was no adjudica-
tion on the merits before the plaintiff died. The final decree
having been entered prior to the plaintiff's death, there was
no error in overruling the defendants' pleas in bar.

As the amended bill of complaint was not demurrable,
and the findings of fact made by the trial judge were not
plainly wrong and no error of law is shown in his rulings, it
follows that the interlocutory decrees should be affirmed
and the final decree affirmed with costs. The final decree
after rescript may be entered *nunc pro tunc* as of some ap-

propriate date after the entry of the decree from which the present appeal was taken and before the death of Theodore T. Ellis. G. L. (Ter. Ed.) c. 235, § 4.

*Ordered accordingly.*